# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4230

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STEVEN J. DELLA ROSE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 466—**David H. Coar**, *Judge.*

———————

ARGUED JUNE 7, 2004—DECIDED APRIL 8, 2005

———————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A grand jury charged Chicago
attorney Steven J. Della Rose with conspiracy to commit
mail fraud and producing a false identification document in
or affecting interstate commerce, alleging that Della Rose
had arranged for an associate to obtain false identification
in the name of Della Rose's client and use that identifica-
tion to fraudulently cash a settlement check made payable
to that client and turn the proceeds over to Della Rose. A
petit jury subsequently convicted Della Rose on these
charges, although the district judge later granted him a

judgment of acquittal on the false identification card charge. The judge ordered Della Rose to serve a prison term of 41 months. Della Rose appeals, contending among other things that the district judge erred in excluding so-called "reverse 404(b)" evidence that Della Rose's associate had previously trafficked in phony identifications, which evidence was offered in part to show that it was the associate, rather than Della Rose, who was the likely perpetrator of the scheme. Fed. R. Evid. 404(b); *see United States v. Wilson*, 307 F.3d 596, 601 (7th Cir. 2002). Because the core of this evidence was hearsay not subject to any exception that would render it admissible, we conclude that the district judge did not abuse his discretion in excluding this evidence. Finding no other error sufficient to warrant a new trial, we affirm Della Rose's conviction. However, we direct a limited remand of his sentence so that the district court may determine whether it would have sentenced Della Rose differently had it realized that the Sentencing Guidelines are advisory rather than mandatory. *See United States v. Booker*, 125 S. Ct. 738 (2005).

## I.

In July 1994, James George retained Della Rose to represent him in connection with a workers' compensation claim against the Chicago Housing Authority ("CHA"). George was employed by the CHA as a janitor. In June 1994, George injured his shoulder, back, and hip as he was removing trash from a CHA high-rise building. Initially, George attempted to continue working but found that he could not handle the more physically demanding aspects of his job. A series of medical examinations and x-rays ultimately would reveal that George had a torn rotator cuff. After one to two weeks of rest and therapy, doctors told George that he could return to work so long as he did not do any heavy lifting. But George's supervisor told George that unless he returned to

unrestricted duty, he faced termination. At that point, George retained Della Rose (with whom he had no prior relationship) to pursue compensation for his workplace injury. At Della Rose's request, George signed both a retainer agreement and a worker's compensation claim form. In the meantime, the CHA put George on disability leave and George began to receive weekly disability checks amounting to 70 percent of his standard pay at the CHA.

George, it turns out, had a number of problems beyond his injury at the CHA. Since the early 1970s, George had been using cocaine in both its powder and crack forms; he had also experimented with heroin and marijuana as well as various other controlled substances. By the late 1980s, George was addicted to both drugs and alcohol, and his alcohol abuse caused him to suffer occasional blackouts and memory loss. He also suffered from mental difficulties that included a history of suicide attempts. By 1989, his problems were causing him to miss so much work that Illinois Bell, where he had worked for more than 19 years, fired him for job abandonment.

After spending 13 months in a Veterans Administration hospital, George was discharged when he tested positive for morphine. George went to live with his mother and began to work for Motorola. Eventually, he lost his job with that company because of his tardiness.

It was in 1991 that George was hired by the CHA. During his employment with the CHA, his personal difficulties persisted. In or about 1993, he telephoned one of his therapists and announced that he was thinking about blowing up a CHA apartment building; he then locked himself inside of a CHA building, drank a pint of whiskey and swallowed a handful of sleeping pills in an effort to kill himself, and passed out. Tipped off to his bomb threat, police arrived and took him away in handcuffs. He was subsequently taken to a hospital psychiatric unit.

Similar episodes occurred in the years after George was injured and he retained Della Rose to pursue the workers' compensation claim. George's drug and alcohol abuse continued, and by his own account it was severe. He was in and out of hospitals for psychiatric treatment, entertained thoughts of both suicide and homicide, and suffered from auditory and possibly visual hallucinations. By 1998, George was in arrears in payments on his house and car and lost both to creditors. A friend took him in until he could find somewhere else to live.

On or about April 17, 1998, George telephoned Della Rose's office to let him know that he had found an apartment in Hammond, Indiana; he left his new contact information with Della Rose's secretary. Soon thereafter, George learned that Della Rose had sent him a letter in care of his mother, advising George that he had been contacted by the CHA and asking George to call him. (George previously had given Della Rose his mother's contact information for use in case George could not be contacted directly.) On or about April 28, 1998, George spoke with Della Rose by telephone. At that time, Della Rose advised George that his case against the CHA remained pending but that the CHA was dragging its feet and that it likely would be some time before it was resolved.

That same month, the CHA stopped issuing disability payments to George. When George contacted Ben Geach, a claims supervisor at the CHA, to find out why he had not received two of the benefits checks he was expecting, Geach told him that his worker's compensation suit had been settled. George immediately followed up with Della Rose's office but was not able to speak with Della Rose at that time.

George would later testify that Della Rose never had a conversation with him in 1998 about settling his case, that he never received a copy of the settlement, and that he never signed the settlement documents. In addition, and

more to the point for purposes of this case, George testified that he did not receive a settlement check, let alone endorse it.

But Della Rose had, in fact, negotiated a settlement of George's suit. Pursuant to the settlement agreement, George was to be paid a total of $80,000 in compensation for a permanent partial disability. Of that amount, Della Rose was to be paid $16,000, a figure amounting to 20 percent of George's recovery (the maximum percentage permitted). An arbitrator for the Illinois Industrial Commission ("IIC"), which handles workers' compensation claims, approved the settlement on May 1, 1998. Among other signatures, the approved agreement—known in IIC parlance as a settlement contract—bore what purported to be George's signature. A forensic document examiner would later testify that this was not, in fact, George's natural signature but rather a series of "drawings" or "attempted drawings." Tr. 410. Based on the evidence available to her, the examiner was not able to identify who executed that signature; George, of course, would testify that he did not.

Pursuant to the settlement, a check in the amount of $80,000 was issued to "James George & Atty. Steven J. Della Rose." Gov. Ex. 6. As noted, Della Rose was to take $16,000 of that amount for his fees and George was to receive the balance of $64,000. An endorsement purporting to be George's was made on the back of the $80,000 check. The government's document examiner would testify that the endorsement was not George's natural signature, and George would later deny endorsing the check. The proceeds of this check were deposited into Della Rose's account. Della Rose then prepared a second check in the amount of $64,000 payable to George. He also prepared a closing statement dated May 16, 1998, reflecting the division of the settlement proceeds between himself and George. The statement also included an acknowledgment by George that he had received the $64,000 check, and a signature purport-

ing to be George's is found immediately below that statement. Again, the document examiner would later testify that it was not George's natural signature, and George himself would deny having signed the statement. On May 22, 1998, that check, bearing what purported to be George's endorsement, was cashed. However, the same documents examiner who reviewed the other documents would testify that the endorsement was not George's natural signature, and George himself would deny ever having endorsed and cashed the $64,000 check.

The individual who actually endorsed George's check was Dennis Ilenfeld, a man who worked part-time in Della Rose's office. Ilenfeld and Della Rose had met in 1995. Ilenfeld, who at one time had operated a laundromat in a building he owned, helped Della Rose install laundry facilities in a building that Della Rose owned. In exchange for Ilenfeld's assistance, Della Rose agreed to represent Ilenfeld in an acrimonious divorce and custody battle. Ilenfeld later began to manage one building, and then a second, that Della Rose owned. Eventually, Ilenfeld was spending 20 hours per week managing Della Rose's buildings and in that capacity he worked out of Della Rose's office several days per week. For his part, Della Rose continued to represent Ilenfeld in the much-prolonged divorce action until 2001. Ilenfeld never charged Della Rose for his management services and Della Rose never formally billed Ilenfeld for his legal work, although on one occasion Ilenfeld did pay Della Rose $11,000 from a settlement he obtained in another case.

Ilenfeld was somewhat of a shady character. In 1992, prior to Della Rose's involvement in the divorce action, he had put together $5,000 with the intent that a politically-connected lawyer use the money to have his connections "influence" the presiding judge's forthcoming decision regarding custody of Ilenfeld's daughter. For a time, Ilenfeld carried a driver's license bearing a social security number that was off by one digit from his actual number. Ilenfeld

used the incorrect social security number, as well as another incorrect version (this one off by a different digit) on a number of occasions, including one instance in which his wife attempted to garnish his wages for unpaid child support. An incorrect social security number was also used in 1992 to (improperly) cash a $19,000 check belonging to Ilenfeld's ex-wife; Ilenfeld denied having cashed the check, but a currency transaction report indicated that he was the one who did so. In 1996, Ilenfeld used the name of a friend to obtain telephone service for his own residence. In 1997, Ilenfeld was held in contempt of court for failure to pay child support. When he declared bankruptcy that same year, he was over $700,000 in debt. Lawrence Starkopf, his ex-wife's attorney, based on his exposure to Ilenfeld over the 13-year life of the divorce action and on conversations with others about Ilenfeld, opined that Ilenfeld was not truthful at all.

In May 1998, Della Rose met with Ilenfeld and asked him to cash a check payable to a client who had recently died. Della Rose identified the deceased client as James George. Della Rose explained that he wanted the check cashed so that George's family could have access to funds and Della Rose could have his fee paid without having to wait for George's financial affairs to be settled in court. Ilenfeld balked at first but Della Rose persisted, reminding Ilenfeld of the "craziness" he had put up with in Ilenfeld's divorce. Tr. 287. Ilenfeld eventually agreed to do as Della Rose asked. On May 20, Della Rose again met with Ilenfeld and told him that he had a contact in the Illinois Secretary of State's Office who could provide a fake identification card for Ilenfeld to use in cashing George's check. At that meeting, Della Rose showed Ilenfeld documents bearing George's signature, and Ilenfeld began to practice that signature. Della Rose had him sign George's name to a couple of documents. When asked at trial, Ilenfeld could not recall whether two of those documents might have been the $80,000 settlement check and the closing statement in-

dicating the division of that amount between Della Rose and George, although he acknowledged that the signature on the closing statement looked like his work.

On May 21, at Della Rose's instruction, Ilenfeld (wearing a wig) went to the Ford City, Illinois Secretary of State's Office and asked to see Mary Romanski. Ilenfeld had never before met or spoken with Romanski. He introduced himself to her as "Dennis" and told her that Della Rose had sent him. Romanski took his picture and asked him to sign an already-completed application for an identification card in George's name. Ilenfeld signed George's name to the form, and Romanski in turn supplied him with an identification card prepared in the name of James George but bearing Ilenfeld's likeness. Ilenfeld testified that he did not pay Romanski for the card. Della Rose paged Ilenfeld later that day to see how things went. In reply, Ilenfeld told Della Rose that all had gone smoothly. Della Rose remarked to Ilenfeld that Romanski was "very good" and that she took care of getting licenses for his "DUI clients." Tr. 296. Phone records indicated that someone in Della Rose's office made four phone calls to Romanski that day—one to her home, one to her pager, and two to her office.

On May 22, Ilenfeld stopped by Della Rose's office and picked up a check in the amount of $64,000, drawn on Della Rose's account and payable to George. When Ilenfeld saw the amount and voiced doubt that the bank would cash a check that large, Della Rose assured him that he would be in his office and advised him to have the bank call him if there were any problems.

Ilenfeld, again wearing the wig, proceeded to Della Rose's bank and presented the check along with the fake identification card. When tellers advised Ilenfeld that they could not cash the check without additional identification, Ilenfeld asked them to call Della Rose. The supervising teller of the bank did so, and in the course of her conversation with

Della Rose she verified the amount of the check as well as Della Rose's social security number, date of birth, and mother's maiden name. She did not advise Della Rose that the man presenting the check was white (George is African-American) or that he was wearing a wig (as was apparently evident to bank personnel). At the bank's request, Della Rose faxed the bank a letter on his office letterhead authorizing the bank to cash the check. Relying on that authorization, the bank cashed the check and gave Ilenfeld $64,000 in $100 bills, which he put into a briefcase. The bank also made a photocopy of the identification card Ilenfeld had presented.

Ilenfeld then returned to Della Rose's office and handed the cash over to him. After counting the money twice, Della Rose gave Ilenfeld $50 to reimburse him for parking. Ilenfeld would later testify that he left the fake identification card with Della Rose. (He would also acknowledge, however, that he may have told government agents that he destroyed the card himself.) Della Rose later told Ilenfeld that the situation with the check had worked out well—that George's family members had gotten their money and that he (Della Rose) was happy.

Needless to say, it did not escape the real James George's attention that although his suit had been settled, he had not seen any of the proceeds. On June 2, 1998, George sent Della Rose a telegram in which he said, "I am aware you cashed my check. Where is my money?" Gov. Ex. 12. Apparently no answer was forthcoming. Within several months of the settlement, Della Rose received a letter from the Illinois Attorney Registration and Disciplinary Commission ("ARDC") forwarding to him a copy of a complaint that George had filed alleging that he had received no money from Della Rose. Della Rose wrote a letter to the ARDC in response in which he stated, among other things, that George had accepted the settlement, signed the settlement contract, and picked up the settlement check from Della Rose's office; that Della Rose "was always under the

impression throughout the case that Mr. George was at-
tempting to 'gold brick' the CHA"; that George had a history
of psychiatric problems; that George had once threatened to
blow up CHA property and had been arrested or detained in
the possession of plastic explosives; and that Della Rose had
been "astonished" to learn from Geach at the CHA that
George was claiming not only that he had not approved the
settlement but that he had never received any money.
Gov. Ex. 29.

> I have no idea nor reason as to why James George
> would stage this incident, except that he is attempting
> to blame others for the problems he suffers. Should he
> have lost or had his settlement funds misappropriated,
> perhaps his home owners or other insurance can fully
> restore him. I am truly sorry for Mr. George's situation,
> but I do not know what else my office can do for
> him. . . .

*Id.* Interestingly, although Della Rose made photocopies of
the documents in his file on George for the ARDC, he sub-
sequently destroyed all of the originals in that file, includ-
ing the cancelled settlement check payable to George, not-
withstanding his awareness of George's ARDC complaint.

In 1999, George filed a civil suit against Della Rose, al-
leging that Della Rose had stolen the $64,000 he was owed
under the settlement contract. George ultimately agreed to
settle the case for $64,000. Before the suit was resolved,
however, George's attorney took Della Rose's deposition. Por-
tions of that deposition were read into evidence during the
trial in this case. In sum, Della Rose testified that George
had both approved the settlement of his worker's compensa-
tion claim and received the $64,000 check for his portion of
the settlement. According to Della Rose, George had stopped
by his office twice in April and May of 1998: on April 23,
1998, George had signed the settlement contract; and on
May 16, 1998, George had endorsed the $80,000 settlement

check, signed the closing statement reflecting division of the proceeds between himself and Della Rose, and accepted Della Rose's check for $64,000 (post-dated May 21, 1998, in order to allow the $80,000 check to clear).

Eventually, the dispute over what happened with the $64,000 check ripened into a federal criminal investigation. In the fall of 2001, federal agents contacted Della Rose's former secretary. She agreed to cooperate with their investigation, and at their behest she telephoned Ilenfeld and had a conversation with him that was, unbeknownst to him, recorded. She told Ilenfeld that investigators were making inquiries regarding the check; she also asked him how it was that his picture had been placed on an identification card in George's name and why two bank employees had identified him as the person who had cashed George's check. Ilenfeld essentially deflected her questions and advised her not to tell investigators anything she did not know. But the phone call caused him to contact an attorney.

Ultimately Ilenfeld, Romanski, and Della Rose were indicted. By this time, Ilenfeld and Della Rose had had a falling out. Della Rose had sued Ilenfeld early in 2001 (the record does not tell us why). Ilenfeld entered into an agreement with the government in which he agreed to plead guilty to conspiring to produce a false identification card and to cooperate with the government; the government in turn agreed that it would advise the court of his cooperation but would not make any sentencing recommendation. As it turned out, Ilenfeld served no time in prison, but was instead sentenced to a three-year term of supervised release. Romanski also pled guilty prior to trial. However, the record before us does not reflect the terms, if any, of her plea.

At trial, Ilenfeld was the government's star witness against Della Rose: it was he who outlined Della Rose's scheme to cash George's settlement check using falsified identification. Romanski, the source of the fake identification card, did not

testify. George testified, confirming that he had never received any of the settlement proceeds. George was questioned at length by attorneys for both the government and Della Rose regarding his troubled history. Pursuant to Federal Rule of Evidence 404(b), the district court also allowed the government to elicit testimony about a previous occasion on which Della Rose had helped someone obtain a false identification card. Richard Britz, a former client of Della Rose, testified that in 1995 or 1996, his driver's license was suspended. Della Rose sent him to Romanski in order to obtain a state identification card under a false name. According to Britz, when he met Romanski at the Secretary of State's office, he told her his real name and that Della Rose had sent him. Romanski, after inquiring what name he wanted to use on the new identification card, proceeded to prepare the card. He was subsequently able to use the identification card to obtain a driver's license at a different Secretary of State facility, after Della Rose told him whom to see at that second facility. Britz testified that he had not met Romanski previously and did not pay her anything for the false identification card she provided. He did pay Della Rose $500 for his assistance.

Following his conviction, the district court ordered Della Rose to serve a prison term of 41 months, the high end of the sentencing range called for by the Sentencing Guidelines.

## II.

### A. Testimony of DeFrancesco

As noted, Britz testified that in 1995 or 1996, Della Rose had arranged for him to obtain a false identification card from Romanski. The district court admitted this testimony pursuant to Federal Rule of Evidence 404(b) in order to explain the relationship between Della Rose and Romanski and to provide context for Ilenfeld's instruction to see

Romanski at the Secretary of State's office and tell her that Della Rose had sent him. R. 88-2 at 6. In response, Della Rose wanted to elicit testimony from Frank DeFrancesco, an acquaintance of Britz, to the effect that Britz told DeFrancesco he had obtained the false identification card not through Della Rose, but through Ilenfeld. DeFrancesco would have further testified that he contacted Ilenfeld and attempted to obtain a false identification card for himself, but that Ilenfeld wanted too much money and consequently they never reached an agreement. The district court excluded the first portion of DeFrancesco's proposed testimony (what Britz told him about obtaining a false identification card from Ilenfeld) as hearsay and the second part (regarding DeFrancesco's own unsuccessful effort to obtain an identification card from Ilenfeld) as irrelevant. Tr. 552-57. Della Rose portrays the exclusion as both incorrect and a devastating blow to his defense. It was Della Rose's theory of the case that the fraud perpetrated on George was one of Ilenfeld's doing. Testimony that Britz had previously obtained a false identification card from Ilenfeld was, in Della Rose's view, both admissible and essential for two purposes: first, to impeach Britz's own testimony that Della Rose had made the arrangements for his phony identification, and second, to prove substantively that Ilenfeld, having previously arranged for a false identification card, was the likely culprit in this case.

We begin with a word about the precise content of the first portion of DeFrancesco's excluded testimony. Throughout his briefs, Della Rose represents that DeFrancesco would have testified that Britz told him that he (Britz) obtained his fake identification card from Ilenfeld. But this is not what DeFrancesco actually said on the witness stand before his testimony was cut off and ultimately stricken by the district court. What DeFrancesco testified was that in 1995 or 1996 (which was the same time period during which Britz testified he had obtained a phony identification card

through Della Rose and Romanski), his driver's license had been suspended for driving under the influence. Aware that Britz himself had lost his license and had obtained a falsified replacement, DeFrancesco asked Britz how he (DeFrancesco) could get a fake driver's license for himself. Tr. 551. According to DeFrancesco, Britz gave him the telephone number of Della Rose's office and told him he should speak with someone named Dennis (presumably Ilenfeld) and that Dennis would take care of getting him a license. Tr. 552-53. Nowhere in DeFrancesco's limited testimony, nor in his attorney's discussion of his proposed testimony with the district judge, do we find the representation that Britz identified Ilenfeld as the source of Britz's own phony driver's license. (The record does not contain an affidavit from DeFrancesco shedding further light on what the content of his testimony would have been.) No doubt one may logically draw that inference from Britz telling DeFrancesco that Ilenfeld was the person to speak with about a fake license. But it is not what DeFrancesco actually testified, and as we shall see, the distinction might matter in evaluating the admissibility of this portion of DeFrancesco's testimony. Nonetheless, recognizing that DeFrancesco's testimony was cut short, we shall give Della Rose the benefit of the doubt and assume that, had his testimony been admitted in full, DeFrancesco would have testified that Britz identified Ilenfeld as the source of his falsified drivers's license.

That testimony would have been relevant in both of the ways Della Rose has identified. First, and most obviously, it would have impeached Britz. Britz's testimony was that he obtained false identification from Romanski through Della Rose. DeFrancesco's testimony would have squarely contradicted Britz on that point. We reject the government's suggestion that this would have amounted to impeachment on a collateral point. Della Rose's defense was that Ilenfeld was the true culprit in the scheme to cash George's settle-

ment check (and that possibly George himself was involved, with the hope of being compensated more than once) and that the scheme had been perpetrated without Della Rose's knowledge or involvement. Britz's testimony tended to undermine that notion by showing that Della Rose had the means (including a willing accomplice at the Secretary of State's office) to obtain fraudulent identification to use in the scheme. The government itself, in its closing argument to the jury, described Britz as "a very important witness." Tr. 621. While we are on the subject, we also reject Della Rose's contention, in passing, that Britz's testimony amounted to improper evidence of his propensity and should have been excluded under Rule 404(b). As we have mentioned, the district court admitted this testimony to explain the relationship between Della Rose and Romanski with regard to obtaining false identification, a matter that was relevant in view of the instruction that Della Rose gave to Ilenfeld to see Romanski and tell her that Della Rose had sent him. R. 88-2 at 6. It was within the district court's discretion to admit Britz's testimony for this purpose. *See United States v. Hughes*, 310 F.3d 557, 565 (7th Cir. 2002) (evidence that co-defendants previously had been involved in different criminal scheme was admissible under Rule 404(b) to establish that they had a working relationship prior to charged crime, "a matter that might have been of some interest to the jury in light of the finger-pointing that took place between the defendants").

Second, DeFrancesco's testimony would have supplied the jury with some basis to believe that Ilenfeld, rather than Della Rose, may have been the perpetrator of the scheme, as the defense posited. In the same way that Britz's testimony lent credence to the government's case, by revealing that Della Rose had previously arranged for Romanski to issue false identification cards for his clients and thus establishing that Della Rose had ready means to carry out the scheme just as Ilenfeld recounted it, DeFrancesco's tes-

timony would have bolstered the defense case by showing that Ilenfeld himself was capable of arranging for phony i.d.'s and was willing to do so. Rule 404(b), though typically invoked by the government as authority for introducing evidence of the defendant's prior bad acts, is a rule that may be invoked by the defendant as well. *United States v. Reed*, 259 F.3d 631, 634 (7th Cir. 2001); *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999).

> Under what has come to be known as "reverse 404(b) evidence," a defendant can introduce evidence of someone else's conduct if it tends to negate the defendant's guilt. The trial court is entitled to exclude this kind of evidence if, upon a balancing of the evidence's probative value against considerations such as prejudice, undue waste of time, and confusion of the issues under Rules 401 and 403 of the Federal Rules of Evidence, it concludes that the evidence would not be beneficial. Such 404(b) rulings, like other evidentiary rulings, are reviewed with deference. . . .

*United States v. Wilson*, *supra*, 307 F.3d at 601 (citations omitted).

But the relevance of DeFrancesco's testimony was not enough to circumvent the obvious hearsay problem. *See United States v. Brown*, 31 F.3d 484, 491 n.8 (7th Cir. 1994) ("even 'other acts' evidence is inadmissible if it is also hearsay"). DeFrancesco's putative testimony that Britz had identified Ilenfeld as the source of phony i.d.'s in Della Rose's office was an out-of-court statement offered for its truth. This is so whether we consider what DeFrancesco actually testified in the district court ("[Britz] told me to call somebody named Dennis and that *he would take care of getting me a license*." Tr. 552 (emphasis ours)), or what Della Rose represents DeFrancesco would have said had he been allowed to testify in full ("Britz told [DeFrancesco] that *Ilenfeld had done it for Britz*." Della Rose Br. at 22 (emphasis ours));

either way, Della Rose was relying on the substance of Britz's statement to DeFrancesco. At trial, Della Rose's counsel never identified an exception to the hearsay rule that would have allowed the admission of the evidence. On appeal, he has suggested that Britz's statement to DeFrancesco was against his penal interest. That is true *if* we assume that DeFrancesco would have testified that Britz identified Ilenfeld as the source of his own false i.d.. That Britz's statement may have been against his penal interest, however, does not by itself suffice, for Rule of Evidence 804(b)(3) renders such statements admissible only if the declarant is unavailable. *See, e.g., United States v. Ochoa,* 229 F.3d 631, 637-38 (7th Cir. 2000). Britz was not literally unavailable (he testified in the government's case); and Della Rose has made no attempt to establish that Britz was unavailable in any of the other senses listed in Rule 804(a).

In his briefs and at oral argument, Della Rose has suggested that DeFrancesco's testimony presented no more of a hearsay problem than did Britz's testimony, such that turnabout was only fair play. That is not quite right, however. To the extent that Britz recounted anyone's out-of-court statements other than his own, they were statements made by Della Rose. Della Rose's statements, to the extent they were elicited from Britz for their truth, constitute admissions that the Rules of Evidence deem to be non-hearsay. Fed. R. Evid. 801(d)(2)(A); *e.g., United States v. Spiller,* 261 F.3d 683, 690 (7th Cir. 2001); *United States v. Emenogha,* 1 F.3d 473, 480 (7th Cir. 1993) (quoting *United States v. Thompson,* 944 F.2d 1331, 1341 (7th Cir. 1991)).

Della Rose rightly points out that the second part of DeFrancesco's proposed testimony was not hearsay. That aspect of his testimony concerned his own efforts to procure a falsified driver's license from Ilenfeld. The district court believed that portion of DeFrancesco's testimony to be irrelevant, but we think it relevant for the same reason that his testimony as a whole was relevant—if Ilenfeld was

willing and able to arrange for false identifications without Della Rose's involvement, then that might have been what occurred vis-à-vis George, as Della Rose himself posits. Of course, standing alone, DeFrancesco's testimony that he and Ilenfeld had negotiated over a phony identification but had been unable to agree on a price would not have provided particularly compelling support for Della Rose's defense. No doubt for that reason, Della Rose contends that the balance of DeFrancesco's testimony, even if hearsay, should have been admitted to explain why DeFrancesco sought out Ilenfeld. Certainly DeFrancesco could have been permitted to explain that he contacted Ilenfeld at Britz's suggestion. But assuming that DeFrancesco would have testified that Britz had identified Ilenfeld as the source of his own false i.d., we are not convinced that the need for context would have compelled the admission of that hearsay statement.

There may have been another basis for the admission of Britz's out-of-court statement about the source of his false i.d., however. Because Britz testified, his statement to DeFrancesco was potentially admissible under Rule 613(b), which permits extrinsic evidence of a prior inconsistent statement by a witness. To the extent Britz's out-of-court statement suggested that he had procured his phony identification through Ilenfeld rather than Della Rose, it was inconsistent with his testimony. The government contends that Della Rose's attorney failed to lay the appropriate groundwork for the admission of Britz's out-of-court statement. Rule 613(b) conditions the admissibility of a prior inconsistent statement on the witness being afforded the opportunity to explain or deny the statement. The government assumes that Britz was never given that opportunity, because when Britz was on the witness stand, Della Rose's counsel asked him only whether he knew Ilenfeld and whether he had obtained his false identification from Ilenfeld (Britz answered no to both questions); Britz was never asked about what, if anything, he told DeFrancesco about his iden-

tification. But the rule itself says only that the witness must have the opportunity to explain or deny his prior statement; it does not say that he must be given that opportunity *before* extrinsic evidence of the statement is admitted. *See* Fed. R. Evid. 613, Advisory Committee Note. Thus, the fact that Britz had not been asked about his statement to DeFrancesco on cross-examination did not necessarily preclude the defense from eliciting testimony from DeFrancesco about the statement; the government could have brought Britz back to the stand in its rebuttal case and asked him about the statement at that time. *See, e.g., United States v. Schnapp*, 322 F.3d 564, 570-71 (8th Cir. 2003); *United States v. Young*, 86 F.3d 944, 949 (9th Cir. 1996); *United States v. McCall*, 85 F.3d 1193, 1196-97 (6th Cir. 1996); *see also United States v. Valencia*, 913 F.2d 378, 385 (7th Cir. 1990) (assuming arguendo that district court may have "technically erred" in barring extrinsic evidence of witness's prior inconsistent statement on ground that witness had not been asked about the statement first, but finding any error harmless); *but see* 3 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, § 332 at 519-20 (2nd ed. 1994) ("Occasionally, however, courts still insist on laying the foundation first, and it seems probable that they have authority to do so under FRE 611.").

But even if we assume that the district court abused its discretion in barring DeFrancesco's testimony, the error was harmless. As we have noted, the defense sought to introduce this evidence in support of the notion that Ilenfeld perpetrated the scheme without Della Rose's knowledge or complicity. The defense posited that Ilenfeld somehow got his hands on George's check (possibly with George's cooperation), procured a false identification card in George's name through his own means, and cashed the check using that phony i.d. Although it was Della Rose himself who authorized the bank to cash the check, Della Rose had (in the defense view) no way of knowing that it was Ilenfeld

rather than George who was standing at the bank teller's window awaiting the proceeds. Evidence that Ilenfeld had previously trafficked in false identification documents arguably would have made it somewhat more likely that Ilenfeld could have pulled this off without Della Rose knowing anything about it.

But the evidence at once makes plain both that the fraudulent scheme began well before Della Rose wrote the settlement check out to George and that Della Rose was complicit in that scheme. According to Della Rose's own deposition testimony, Della Rose met with George in his office on April 23, 1998; and after discussing the proposal to settle the worker's compensation claim for $80,000, George signed the settlement contract in Della Rose's presence. Gov. Ex. 13 at 94-97. Yet, according to the government's document examiner, the signature on that contract was not in George's natural writing. After the settlement contract was approved, a check in the amount of $80,000 was issued payable to George and Della Rose jointly. Della Rose testified that George again came to his office on May 16, 1998, and endorsed that check over to Della Rose in Della Rose's presence. *Id.* at 112. Again, however, the signature was not in George's natural writing. Della Rose maintained that he then wrote a post-dated check to George in the amount of $64,000 and gave it to George. Della Rose also prepared a closing statement reflecting that he issued the check for $64,000 to George and retained the balance of $16,000 for himself. According to Della Rose, George signed that statement as well, again in Della Rose's presence. *Id.* at 110. Yet again, the signature was not in George's natural writing. Indeed, a visual inspection of the signatures on the settlement contract, the $80,000 check, and the closing statement readily reveals them to be distinct from George's natural signature. The compelling inference raised by this evidence is that George did not sign these documents and that Della Rose knew full well he did not. Indeed, it is worth not-

ing that although the unnatural signatures on the settlement contract, the $80,000 check, and the closing statement are visibly inconsistent with George's natural signature, they are remarkably consistent with one another and, not coincidentally, consistent with the signature that Ilenfeld forged on the $64,000 check payable to George. *See* Gov. Ex. Moran 2. Which suggests that Ilenfeld signed the entire set of documents—something he could not have done without Della Rose's knowledge and complicity.

We also reject Della Rose's contention that the exclusion of DeFrancesco's testimony deprived him of due process. Although DeFrancesco's testimony would have lent some support to the defense theory, it was neither direct nor compelling proof that Ilenfeld, rather than Della Rose, was the perpetrator of the scheme. In any case, even constitutional errors may be deemed harmless, *e.g.*, *United States v. Souffront*, 338 F.3d 809, 836 (7th Cir. 2003), *cert. denied*, 540 U.S. 1201 (2004), *and cert. denied*, 124 S. Ct. 2893 (2004), and for the reasons we have just discussed, any error in the exclusion of this testimony indeed was harmless.

## B.   Exclusion of Extrinsic Proof as to Ilenfeld and George

Della Rose also challenges the exclusion of extrinsic evidence concerning both Ilenfeld and George. With respect to Ilenfeld, Della Rose sought to introduce additional testimony that Ilenfeld had used multiple social security numbers. He also sought to introduce evidence that during the divorce and custody litigation with his ex-wife, Ilenfeld covertly tape-recorded some 13 telephone conversations with his wife and then dubbed portions of them together to produce an unflattering amalgam that he either used or attempted to use against her in the custody proceeding. With respect to George, Della Rose sought to establish that, several years before his settlement with the CHA, George was spending some $10,000 per month on his drug habit.

We find no abuse of discretion in the district court's decision not to allow extrinsic proof on these points, even assuming that the proffered evidence was admissible in form and relevant in some way. During his testimony, Ilenfeld admitted to having used social security numbers other than his actual number; extrinsic proof that he used multiple numbers thus would not have materially contributed to the jury's assessment of his veracity or of the possibility that it was he alone, and not Della Rose, who defrauded George. As for the tape that Ilenfeld purportedly dubbed for use against his ex-wife, Ilenfeld was asked about this on cross-examination and denied having made such a tape. The district court was entitled to conclude, pursuant to Federal Rule of Evidence 403, that whatever marginal probative value extrinsic evidence on this subject might have was substantially outweighed by the prospect of a sideshow as to what occurred during Ilenfeld's divorce. As for the extent of George's drug habit, the jury was well aware that George had a serious drug problem; George admitted as much in his testimony. George had been asked at his deposition in the civil suit whether he had ever spent as much as $10,000 on his habit and had denied it. The same question was put to him again at trial and again he answered no. In view of the fact that the jury was aware that George had a serious drug habit, the district court was entitled to cut off further inquiry into this subject.

## C.   Cross-examination of Lawrence Starkopf

As we noted earlier, attorney Lawrence Starkopf testified in the defense case regarding Ilenfeld's character for truthfulness, opining that "Mr. Ilenfeld is not truthful at all." Tr. 538. On cross-examination, the government began to explore Starkopf's familiarity with Della Rose and ultimately asked Starkopf whether he had an opinion as to Della Rose's reputation for truthfulness and honesty within

the legal community. Tr. at 542. Della Rose's counsel objected to the question and the court sustained the objection. Tr. 546. Although Starkopf never answered the question, in Della Rose's view "the cat was out of the bag at that point and it was perfectly clear to the jury what the Government expected Starkopf to say." Della Rose Br. at 35. Because general evidence of the defendant's character is not admissible in a criminal case unless the defense has opened the door to this subject, *see* Fed. R. Evid. 404(a); *United States v. Bonner*, 302 F.3d 776, 781 (7th Cir. 2002), Della Rose contends that the improper question and the apparently negative answer the government expected Starkopf to give prejudiced him.

We disagree. Whatever opinion Starkopf had about whether Della Rose was honest, and whatever expectation the government had as to what Starkopf would have said, the fact is that Starkopf did not answer the question. Any inference as to Starkopf's opinion derives solely from the fact that the government posed the question to him. But, as in every case, the jury was instructed not to give any evidentiary weight to the questions and statements of attorneys, Tr. 669, and we presume that the jury followed that instruction, *e.g. United States v. Eberhart*, 388 F.3d 1043, 1050 (7th Cir. 2004). As the district court aptly observed, "Expectations are not evidence, nor are lawyer's questions . . . As there was no prejudicial evidence admitted against Defendant during the cross-examination of Starkopf, Defendant's objection at this point is misplaced." R. 104 at 11.

### D.  Government's closing arguments

Della Rose cites five instances during the government's closing arguments in which he believes the prosecutors made inappropriate remarks that were prejudicial to him.

No objection was raised as to four of the remarks, meaning that our review is limited to one for plain error alone. In order to establish plain error, Della Rose must show "not only that the remarks denied [him] a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003) (internal quotation marks and citations omitted).

We detect in the prosecutors' remarks no error sufficient to warrant a new trial. The one statement to which a timely objection was made concerned the prosecutor's previous experiences with Della Rose's counsel, whom he said was "really good," had "intimidated me in the past in other cases," and had "smack[ed] me around." Tr. 658. The prosecutor promptly moved on once the defense objected. Although Della Rose rightly observes that these remarks had nothing to do with the evidence and tended to cast the trial in terms of a "joust between the prosecutor and defense counsel," Della Rose Br. at 38, we can see no way in which Della Rose's rights were materially harmed by the remarks.

As for the other remarks, none rise to the level of plain error. When the prosecution asked the jury, "Do you believe James George and all the corroborative evidence that supports his testimony, or do you believe Steven Della Rose and all the lies he told Ben Geach and the ARDC and at a civil deposition under oath to cover his tracks?", Tr. 610, he was echoing a view of the case posited by defense counsel himself, who had previously suggested to the jury that the case would come down to whom the jurors believed. Tr. 53, 57-58. We do not think that the remark can reasonably be construed as an invitation automatically to acquit Della Rose if jurors thought that George or another prosecution witness had lied or conversely to convict him unless it could identify a government witness who had lied. *Cf. United States v. Vargas*, 583 F.3d 380, 386-87 (7th Cir. 1978). Nor do we believe that the prosecutor improperly remarked on

the defendant's decision not to testify in this case when he contended that there was no evidence other than the "self-serving statements in Mr. Della Rose's testimony [in the civil litigation] and Mr. Della Rose's letter [to the A.R.D.C.]" that George had visited Della Rose's office in April or May, as the defense posited. Tr. 614. As there is no reason to believe that Della Rose was the only witness who could have testified as to when George stopped by Della Rose's office (Della Rose had a secretary, for example), we do not think the remark can be understood as an implicit comment on the fact that Della Rose himself did not testify. The prosecutor's characterization of something that Della Rose had said in his letter to the A.R.D.C. as "the most ridiculous statement I've ever heard," Tr. 623, could be understood in part as a legitimate comment, based on the trial evidence and reasonable inferences therefrom, on the credibility of the letter's assertions. *See United States v. Patterson*, 23 F.3d 1239, 1250-51 (7th Cir. 1994). To the extent that the "I've ever heard" portion of the remark verged on the prosecutor offering a personal opinion on credibility, *see id.* at 1250, it was not so serious as to have deprived Della Rose of a fair trial. Finally, the prosecutor's suggestion that Della Rose, "a former prosecutor himself," produced to the A.R.D.C. photocopies rather than originals of the documents in George's file, and destroyed the original settlement check payable to George, in order to make it more difficult for a handwriting expert to detect a forged signature, Tr. 660-61, was an argument with a basis in inferences that could reasonably be drawn from the testimony. It was therefore within the realm of proper argument.

### E.  Sentencing

Della Rose was sentenced in December 2003, more than a year in advance of the Supreme Court's recent watershed decision in *United States v. Booker*, *supra*, 125 S. Ct. 738. At sentencing, the district court made a number of factual

determinations independent of the jury's verdict which, pursuant to the pertinent provisions of the Sentencing Guidelines, elevated Della Rose's offense level and the corresponding sentencing range. Specifically, the court found that: (1) Della Rose had endeavored to obstruct justice by attempting (unsuccessfully) to convince an acquaintance to give false testimony on his behalf, *see* U.S.S.G. § 3C1.1 (Nov. 2003); (2) that Della Rose knew or should have known George was a vulnerable victim, in view of his history of mental and drug problems and the perception that his charge of fraud would not be credible as a result, *see* § 3A1.1(b)(1); (3) that Della Rose, in defrauding George, had abused the position of trust that he occupied as George's lawyer, *see* § 3B1.3; and (4) that Della Rose had acted as a manger or supervisor vis-à-vis Ilenfeld and Romanski, *see* § 3B1.1(c). These enhancements had the effect of increasing Della Rose's offense level from an initial level of 12, with a corresponding sentencing range of 10 to 16 months, to level 20, with a sentencing range of 33 to 41 months. Although the *Booker* decision does not preclude a sentencing judge from making factual findings that have the effect of increasing the Guidelines sentencing range, it does render the Guidelines advisory rather than mandatory.

Della Rose did not make a *Booker*-type objection to the sentencing methodology that the district court followed, so our review of the sentence imposed is for plain error. *See Booker*, 125 S. Ct. at 769. The district court sentenced Della Rose believing that the Sentencing Guidelines were mandatory, so in retrospect the sentence was erroneous in that respect. However, in order to establish that the error rises to the level of plain error, Della Rose must also show that the error "affect[ed] substantial rights," Fed. R. Crim. P. 52(b), "which is to say that it made [him] worse off," *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005). We cannot determine whether Della Rose was prejudiced by the error without knowing whether the district court would have

been inclined to sentence him more leniently had it known that the Guidelines were advisory rather than mandatory. *United States v. Paladino*, Nos. 03-2296, *et al.*, 2005 WL 435430, at *8 (7th Cir. Feb. 25, 2005). It has not escaped our attention that the district court sentenced Della Rose at the high end of the Guidelines range, but that alone does not rule out the possibility that the judge might have imposed a lesser sentence had he known that the Guidelines did not bind him. The judge picked a sentence at the top of the range believing that his discretion was confined to the range specified by the Guidelines; had he realized that his discretion was broader than that, and had he thought that the Guidelines range as a whole was too high, then he conceivably might have sentenced Della Rose to a lesser term. *Id.* at *9.

Pursuant to the course we outlined in *Paladino*, we therefore order a limited remand of the sentence to the district court so that the court may consider whether it would reimpose the original sentence if it were directed to resentence Della Rose in light of *Booker*. *Paladino*, 2005 WL 435430, at *10. If the district court answers that question in the negative, indicating that it would have imposed a lesser sentence had it known that the Guidelines were merely advisory, then plain error will have been established and we shall vacate the sentence in order to permit resentencing. *Id.* If, on the other hand, the district court concludes that it would reimpose the same sentence, then we shall proceed to consider whether that sentence is plainly erroneous in the sense of being unreasonable. *Id.*, citing *Booker*, 125 S. Ct. at 765.

### III.

For the reasons discussed above, we AFFIRM Della Rose's conviction but direct a limited REMAND of the sentence so that the district court may determine whether it would have sentenced Della Rose differently had it known that the

Sentencing Guidelines are advisory rather than mandatory. We retain appellate jurisdiction pending the outcome of the limited remand we have ordered.

A true Copy:

     Teste:

                           _____
                         *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*