# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-4235 & 03-2483

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDWARD SEALS and
EARNEST D'MARCO JOHNSON,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 01 CR 30140—**Michael J. Reagan**, *Judge.*

———————

ARGUED FEBRUARY 25, 2005—DECIDED AUGUST 16, 2005

———————

Before BAUER, POSNER, and RIPPLE, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury found defendants-appellants Edward Seals and Earnest D'Marco Johnson guilty of one count of aggravated bank robbery in violation of 18 U.S.C. § 2113(a) and one count of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) (A)(ii). The district court sentenced Seals to 360 months' imprisonment and ordered restitution in the amount of $42,169.87. Johnson was sentenced to 162 months' imprisonment and ordered to pay restitution in the amount of $42,882.59. The

defendants appeal the district court's decision to exclude reverse 404(b) evidence, their sentences, and the orders of restitution. We affirm the district court's evidentiary ruling and orders of restitution, but order a limited remand on the defendants' sentences pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I.  Background

On June 11, 2001, four masked, African-American men in camouflage fatigues robbed the Metro East Credit Union ("Credit Union") in Cahokia, Illinois. An investigation led to the arrests of Jonah Paschal and Rasheed Townsend. Both men gave statements and proffers admitting their involvement, explaining the planning and preparation for the robbery, and identifying their fellow robbers as co-defendants Johnson and Seals. On July 16, 2002, a superseding indictment was returned charging Seals and Johnson with aggravated bank robbery and using a firearm in a crime of violence.

On June 17, 2002, about one month before the trial, the district court ordered the government to produce police reports pertaining to another bank robbery that had occurred on June 25, 2001, in New Baden, Illinois. Seals' counsel claimed that the defense needed the New Baden robbery reports to explore whether a similar *modus operandi* existed between the two robberies. New Baden is 31 miles from Cahokia. The bank there was robbed by five African-American men wearing disguises; one wore a woman's dress and another was dressed as a construction worker. The robbers were armed with handguns, and they directed a bank employee to obtain cash and hand it over at gunpoint. The perpetrators of the New Baden robbery were caught and convicted. *See United States v. Wingate*, Criminal No. 01-30103-MJR (S.D. Ill. 2001). The government produced the reports but later made a motion *in limine* to

exclude evidence of the New Baden robberies from trial. On August 20, 2002, the district court granted the government's motion; it ruled that there was not enough similarity between the two robberies to make the New Baden evidence relevant and that the evidence would confuse the jury.

The case proceeded to trial, where Paschal and Townsend testified as to how the robbery of the Credit Union in Cahokia was planned and executed. Paschal identified Seals and Johnson at trial, stating that he had been friends with Johnson for several years and had known Seals since high school. Johnson, he recalled, introduced him to Townsend. The four of them agreed to rob a bank. In furtherance of that end, he, Johnson, and Seals stole a utility van with "Weir Cooling" printed on the side. Detective Michael Bailey testified that the owners of the Weir Cooling van reported it stolen or missing on or about June 11, 2001, the day of the robbery.

Paschal testified that on the day of the robbery, the four men developed their plan at his house. He recalled that his cousin, Tiffany Paschal, who also lived at the house, was present, and that he told her they intended to rob a bank. Jonah Paschal provided everyone with the military fatigues they wore during the robbery. Townsend supplied the rifle and handguns they used, along with a blond wig.

Paschal recalled that he and the others drove the stolen van to the Credit Union. He and Johnson covered their faces with nylons, and then the four men entered the bank. Paschal and Seals stayed in the lobby during the robbery; a surveillance camera took their photograph, and he identified Seals and himself in one of the pictures. Townsend and Johnson jumped the teller counter. When they returned, they had metal containers and zipper bags in their hands. The four men then ran out to the van and drove off. Both Detective Bailey and Credit Union customer Michelle Accord testified that the robbers escaped in a Weir Cooling

van."

Paschal testified that they drove to the south end of East St. Louis, where they abandoned the van in some tall weeds and bushes. They removed their fatigues, emptied the metal containers of money, and hid the rifle used during the robbery. They then walked to a house owned by Townsend's grandmother to split up the money. Paschal stated that he, Seals, and Johnson each took $10,000 of the robbery proceeds, and Townsend received the balance. The Credit Union determined that $39,976.15 was stolen.

Paschal testified that after the robbery he left town and did not return until later that summer. Upon his return, Johnson came to his house to ask where the rifle from the robbery was hidden. Paschal recalled that Johnson was driving a Bonneville he had bought with his share of the robbery proceeds. The two of them returned to where they had left the van and other items and recovered the rifle. The van was no longer there; Johnson told Paschal he had burned it. Detective Bailey testified that the Weir Cooling van was recovered after the robbery. It had been burned, but several items inside could be identified, including a camouflage top, nylons, and a melted gas can.

Finally, Paschal testified that on June 13, 2002, while he was being held in the Marshal's holdover cells at the court-house, Seals threatened to kill him or his family if he testi-fied. Three other inmates—John Mielke, Frederick Evans, and Undra Seawood—testified at trial that they overheard the threat, and all three identified Seals as the person who uttered it. Seawood further testified that he later spoke with Seals, who confided, "If the two guys would have just kept their mouth closed, they wouldn't have no case on [me]."

Townsend's testimony at trial supported Paschal's version of the events. He testified that during the summer of 2001

he was friends with Seals and Johnson, who introduced him to Paschal. The morning of the robbery, Johnson and Paschal picked him up in a stolen van, and together they picked up Seals. He acknowledged that he provided the guns, ammunition, and blond wig that were used in the robbery. Townsend stated that they drove to Paschal's house to plan the robbery, that Tiffany Paschal was there, and that she saw the four leave in the van, dressed in fatigues. During the robbery, he and Johnson retrieved metal containers from a safe in the back of the Credit Union. Townsend identified Johnson wearing a wig in a surveillance camera photograph taken at the Credit Union, and identified Seals and Paschal in other images. He also identified both Seals and Johnson in court. He stated that they left the van in East St. Louis and walked to his grandmother's house to divide the money.

Townsend recalled that some time after the robbery he spoke with Johnson, who told him he had burned the van. Johnson also told him that he had bought a Bonneville with the proceeds from the robbery. In addition, Townsend saw Seals driving a white Oldsmobile that he had not known Seals to have owned before the robbery. Finally, Townsend stated that Seals threatened him when they were being held with other prisoners in the Marshal's holdover cells. Seals told him that if he testified against him he would kill Townsend's family. Inmates Mielke and Seawood testified that they overheard Seals make threatening remarks to an African-American male who fit Townsend's description.

Tiffany Paschal also testified at trial. She confirmed that she lived in the same house as her cousin, Jonah Paschal, and that she recognized Seals and Johnson as friends of his; she also identified Seals and Johnson in court. On June 11, 2001, she came home from school to find Jonah Paschal, Seals, and Johnson with a smaller, light-skinned African-

American male who lived near the Princess Motel.[1] Jonah Pascal told her they were going to rob a bank. She testified to having seen a blond wig in the room, and that the four men left the house dressed in fatigues. She saw them drive away in a van with writing on its side, which at trial she identified as a Weir Cooling van.

According to Tiffany Paschal, Jonah Paschal returned to the house after the robbery, showed her his share of the money, and assured her that she "didn't have to worry about nothing no more." She stated that a few weeks after the robbery, Johnson stopped by the house in a gray Bonneville. Tiffany Paschal also recalled that Seals came by the house in a white car which she had not known him to have owned before the robbery. After the robbery, she received a phone call from a man she was certain was Seals, asking if she had talked to police and was she going to testify. He told her that his life was on the line and that she should stay quiet.

Jerry Dinges, who owns a used car lot in Belleville, Illinois, also testified at trial. He stated that a couple of days before June 12, 2001, a young, African-American man came to his business to look at automobiles and discuss financing. The man was looking at a 1987 Oldsmobile Model 98. Dinges told the man that he did not provide financing, and the man replied that he would be back later. On June 12, 2001, the man returned with his mother, purchased the Oldsmobile with $2,500 cash, and drove the car off the lot that day. Dinges identified the man as Seals.

Ghassan Saffaf, who operates "Brotherhood Motors," a used car lot in St. Louis, Missouri, also testified for the government. He stated that on June 11, 2001, two African-American men came to look at cars. One of them made a $1,500 cash down payment for a 1986 Chevrolet

---

[1] Townsend lived behind the Princess Motel.

Monte Carlo. At trial, Saffaf identified the name Ernestine Johnson of Cahokia, Illinois, as the purchaser on the bill of sale and the name D'Marco Johnson in the signature block. The second man provided Saffaf with a U.S. Treasury check made out to Terry Taylor as proof of income. Saffaf stated that the purchaser of the Monte Carlo returned a few days later because the car had broken down and paid an additional $2,200 in cash to exchange it for a silver Bonneville. The bill of sale for the Bonneville had the name Earnest D. Johnson on it.

Terry Taylor testified at trial. He stated that he is a barber who lives in East St. Louis and that he knows Johnson, Seals, Paschal, and Townsend. On the night before the robbery, Johnson, Townsend, and Paschal stopped by his house in an old work van. On the day of the robbery, sometime between 3:00 p.m. and 5:00 p.m., Johnson and Seals stopped by again. After Seals left, Taylor and Johnson took the Metro Link to Brotherhood Motors in St. Louis, where Johnson bought a used Monte Carlo. He provided a U.S. Treasury check as proof of income for Johnson. Taylor also testified that he was incarcerated from May 11, 2002, until July 23, 2002, during which time he cut hair. He cut Johnson's hair on at least one occasion, during which time Johnson passed him notes that outlined a false version of the events the day of the robbery and suggested that he "just keep it plain and simple and don't remember too much." These notes were admitted into evidence, and a handwriting expert testified that Johnson wrote them.

On August 23, 2002, the jury found Seals and Johnson guilty of the bank robbery and firearm charges. The district court sentenced the defendants and ordered restitution. The defendants timely appealed.

## II. Discussion

Seals and Johnson first challenge the district court's

decision to exclude evidence pertaining to the New Baden
bank robbery. They argue that the district court abused its
discretion by applying the wrong legal rule and that this
error was not harmless. They also contend that the district
judge violated their Sixth Amendment rights as interpreted
in *United States v. Booker*, 125 S.Ct. 738 (2005), by making
impermissible findings of fact at sentencing and ordering
restitution in an amount that had not been determined by
the jury. We address these issues in turn.

## A.  Defendants' Evidentiary Challenge

This court reviews a district court's evidentiary decisions
for abuse of discretion. *United States v. Reed*, 259 F.3d 631,
634 (7th Cir. 2001). Generally, we afford great deference to
a district court's determinations in this area. *United States
v. Wilson*, 307 F.3d 596, 601 (7th Cir. 2002) (citing
*United States v. Walton*, 217 F.3d 443, 450 (7th Cir. 2000)).
If the district court's decision rested on an error of law,
however, then it is clear that an abuse of discretion has
occurred because it is always an abuse of discretion to base
a decision on an incorrect view of law. *United States v.
Mietus*, 237 F.3d 866, 870 (7th Cir. 2001) (citing *Cooter &
Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)); *see also
United States v. Wesela*, 223 F.3d 656, 664 (7th Cir. 2000).
We review the district court's determination of the appro-
priate legal standard *de novo. United States v. Cotnam*, 88
F.3d 487, 498 (7th Cir. 1996).

Rule 404(b) of the Federal Rules of Evidence is typically
used by prosecutors seeking to introduce evidence of a crim-
inal defendant's prior misconduct as proof of motive or plan
to commit the crime at issue. *Reed*, 259 F.3d at 634.
However, a defendant can seek to admit evidence of other
crimes under this rule if it tends to negate the defendant's
guilt of the crime charged against him. *United States v.
Della Rose*, 403 F.3d 891, 901 (7th Cir. 2005). This is

commonly referred to as reverse 404(b) evidence. In determining whether to admit reverse 404(b) evidence, a district court must balance "the evidence's probative value under Rule 401 against considerations such as prejudice, undue waste of time, and confusion of the issues under Rule 403." *Reed*, 259 F.3d at 634; *see also Della Reese*, 403 F.3d at 901-02; *Wilson*, 307 F.3d at 601. We adopted this rule from a decision by the Third Circuit, *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991), which distinguished between the standards that govern admissibility of standard 404(b) and reverse 404(b) evidence. *Id.* at 1404-05. *See also Reed*, 259 F.3d at 634 (citing *Stevens*); *Walton*, 217 F.3d at 449 (same); *Agushi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999) (same). *Stevens* held that "a lower standard of similarity should govern reverse 404(b) evidence because prejudice to the defendant is not a factor." *Stevens*, 935 F.2d at 1404.

The district court in the instant case did not reference any case law involving reverse 404(b) issues in its analysis. Rather, the district judge stated that *Huddleston v. United States*, 485 U.S. 681 (1988), "instructs what I need to look at in terms of 404(b) evidence and the ability of the Government to bring out 'prior bad acts.'" Trial Transcript, 9:8. *Huddleston* involved the admissibility of standard 404(b) evidence. The district court explained:

> One of the prongs in the *Huddleston* case requires a similarity of the prior bad act such that it would be fair to use it in the instant case. It seems to me that that same logic applies in determining whether or not the defense can bring out a separate crime committed by separate individuals to allege that those individuals are the ones who committed the instant crime. *I am going to hold the defense to the same standard that I held the Government*, and that is there has to be enough similarity that the jury is not confused and that the evidence becomes relevant.

*Id.* at 9:8-9 (emphasis added). Contrary to the district judge's statement, the defense is not held to as rigorous of a standard as the government in introducing reverse 404(b) evidence. *Agushi*, 196 F.3d at 760 (citing *Stevens*, 935 F.2d at 1404). By applying the wrong legal standard, the district court abused its discretion. *Mietus*, 237 F.3d at 870.

This is not to say that the evidence proffered by Seals and Johnson should have been admitted. It was irrelevant, and thus inadmissible. FED. R. EVID. 402. The similarities between the two robberies were generic. Many robbers disguise their identities, carry firearms, and use a stolen vehicle in their getaway. Moreover, the facts underlying the two robberies were dissimilar. The number of robbers was different. The disguises they wore were different. The defendants contend that both robberies involved a man disguised as a woman, but there is nothing similar about the Cahokia robber wearing a blond wig and fatigues and the New Baden robber wearing a woman's dress. The guns the robbers used were different. Finally, the robbers' *modus operandi* was different; while the robbers of the Cahokia Credit Union vaulted over the teller counter to retrieve the money themselves, the New Baden robbers waited on the customer side of the tellers station for bank employees to bring them the money at gunpoint. The defendants rely on a note that Detective Bailey made in a report dated June 25, 2001, that the *modus operandi* of the New Baden robbers appeared similar to that of the Cahokia Credit Union robbers. Although that may have appeared true to the detective at first blush the afternoon of the New Baden robbery, the differences between the robberies are apparent.

The defendants rely heavily on the fact that the robberies occurred two weeks and 31 miles apart. Thirty-one miles might not appear very far on a globe, but in practical terms these two robberies occurred in separate counties. If this is all it took to admit evidence of other crimes, district courts would be reluctant to exclude evidence of dissimilar bank

robberies in neighboring counties for weeks thereafter. Although we appreciate the fact that the legal standard for admitting reverse 404(b) evidence is relatively lenient, the evidence must still be relevant. Here, it was not.

Even if the evidence involving the New Baden robbery should have been admitted, its exclusion was harmless in light of the overwhelming evidence presented by the government at trial. We employ the harmless error standard because the defendants preserved their objection on this issue when they challenged the government's motion *in limine*. *See* FED. R. EVID. 103; *see also Wilson v. Williams*, 182 F.3d 562, 563 (7th Cir. 1999) (en banc) (holding that "a definitive ruling *in limine* preserves an issue for appellate review, without the need for later objection."). This court will only reverse a defendant's conviction if the erroneous decision by the district court to exclude evidence "had a substantial influence over the jury and the result reached was inconsistent with substantial justice." *Reed*, 259 F.3d at 634 (quoting *Walton*, 217 F.3d at 449) (internal quotes omitted); *see also Agushi*, 196 F.3d at 759 (quoting *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997)). We consider the "overall strength of the prosecution's case against the defendant[s]" in assessing the harmlessness of the district court's evidentiary ruling. *United States v. Manske*, 186 F.3d 770, 779 (7th Cir. 1999).

The government's case was strong enough that the admission of evidence pertaining to the New Baden robbery would not have exonerated Seals or Johnson. The testimony given at trial by the defendants' erstwhile collaborators, Paschal and Townsend, was highly incriminating. The defendants argue that this testimony was unreliable because it was motivated by a desire to secure reduced sentences, but we disagree. The testimony by Paschal and Townsend was detailed and highly consistent. What is more, it was consonant with testimony given by Tiffany Paschal at trial. It was corroborated by the testimony of Credit Union

employees. It was corroborated by the used car dealers who testified that Seals and Johnson paid cash for their automobiles the day of or after the robbery. And it was corroborated by the other inmates and acquaintances who testified that the defendants tried to coerce them or Paschal and Townsend not to testify. The overwhelming evidence eliminates any doubt that the exclusion of evidence of the New Baden robbery led to a result that was inconsistent with substantial justice.

The defendants argue that the exclusion of evidence involving the New Baden robbery must have had a substantial impact on the jury because it denied them the primary evidence in support of their defense. In *United States v. Byrd*, 208 F.3d 592 (7th Cir. 2000), we recognized that "[e]xclusion of evidence which is the only or the primary evidence in support of a defense is deemed to have had a substantial effect on the jury." *Id.* at 594. In *Byrd*, the defendant, a federal prisoner, was convicted of assaulting a police officer who was trying to secure him in the back seat of a squad car. *Id.* at 593. His defense at trial was that the shackles he wore made attacking the officer impossible. *Id.* at 594. The district court denied his request to present his shackles and restraints to the jury. *Id.* at 595. We reversed, holding that because the evidence was central to his defense, its exclusion affected his substantial rights and was not harmless. *Id.* at 596. In so ruling, we emphasized that the holding should be construed narrowly in light of the "peculiar facts of this case." *Id.*

*Byrd* is distinguishable from the instant case. Perhaps most importantly, the evidence pertaining to the New Baden robbery was neither the only nor the primary evidence in support of the defendants' claim that they were not present at the robbery. Seals called three witnesses who testified that he was at a friend's birthday party at the time of the robbery. His mother, who was among these witnesses, also testified that she bought the used Oldsmobile for him

the day after the robbery as a gift. By contrast, the defendant in *Byrd* called no witnesses. Although Johnson declined to testify on his own behalf or call witnesses, he tried to recruit Terry Taylor to provide a false alibi.[2] What is more, he stood to benefit from statements made by Seals' witnesses which challenged the government's assertion that he and Seals were together the day of the robbery.

Furthermore, in *Byrd* the only evidence that the defendant assaulted the police officer came from the police officer himself and his partner, both of whom the court noted had a history of unpleasant dealings with the defendant. That was not the case here. Seals and Johnson argue that Paschal and Townsend testified out of self-interest, but they cannot say the same about the many other witnesses whose testimony corroborated their stories. In sum, we do not believe that the exclusion of the New Baden robbery evidence was so fundamental to Seals' and Johnson's defense that the trial was not fair in its absence.

## B. Defendants' Sentencing Challenges

Both Seals and Johnson point out that their sentences and the amounts they were ordered to pay in restitution were based upon judge-made findings of fact and argue that these findings violated their Sixth Amendment rights as interpreted in *Booker*. Seals' sentence of 360 months' imprisonment included a term of 276 months for the count of aggravated robbery and a term of 84 months for the count of using a firearm during the robbery, to be served consecutively. Johnson's sentence of 162 months' imprisonment included a term of 78 months for the count of

---

[2] Taylor's testimony about Johnson's efforts to instruct him how to testify was the basis for the district judge's finding that Johnson obstructed justice.

aggravated robbery and 84 months for the count of using a firearm during the robbery, to be served consecutively. Both defendants' sentences for the first count included enhance-ments based on the district court's findings of fact that they had robbed a financial institution, acquired over $10,000 in proceeds from the robbery, and obstructed justice. As for the second count, the Sentencing Guidelines directed the district judge to impose the statutory minimum for the offense, which he did in both of their cases. In addition, the district judge determined that Seals qualified as a career offender under § 4B1.1 of the Sentencing Guidelines and adjusted his sentence accordingly. Because neither defen-dant raised a challenge below invoking the Sixth Amend-ment or the line of cases that began with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), we review for plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993).

We begin by addressing Seals' challenges to the district judge's finding that he qualified as a career offender under § 4B1.1 of the Sentencing Guidelines. First, he argues that his career offender sentence must be vacated because the jury did not find that he was represented by counsel during his two predicate convictions. Seals acknowledges that his prior convictions were obtained in full compliance with this Constitutional prerequisite, but contends that the jury was required to make that finding. We disagree. Section 4B1.1 does not specifically require such a finding. Moreover, there is a strong presumption that prior convictions are constitu-tionally valid which Seals has not overcome. *United States v. Redding*, 104 F.3d 96, 99 (7th Cir. 1996) (citing *Cuppett v. Duckworth*, 8 F.3d 1132, 1136 (7th Cir. 1993) (en banc)).

Seals also contends that his career offender sentence must be vacated because the jury did not find that he was 18 years old at the time of the robbery, which is a prerequi-site for application of § 4B1.1. U.S.S.G. § 4B1.1(a)(1). Seals does not dispute that he actually was 18 at the time of the robbery; in fact, his presentencing report indicated he was

21. His argument is that the jury's failure to make this threshold determination violated his Sixth Amendment rights. In *United States v. Pittman*, 388 F.3d 1104 (2004), we held on this same issue that any error that occurred as a result of the judge—as opposed to the jury—finding for purposes of § 4B1.1(a)(1) that a defendant was at least 18 years old at the time of his offense was harmless. *Id.* at 1109. *Pittman*, however, was recently vacated by the Supreme Court and remanded for further consideration in light of *Booker*. *Pittman v. United States*, 125 S.Ct. 1946 (U.S. Apr. 25, 2005), *reh'g denied*, 125 S.Ct. 2539 (U.S. June 6, 2005). Our reconsideration of the matter is pending.

There is no need to resolve the *Pittman* issue today because both Seals and Johnson are otherwise entitled to a limited remand pursuant to the procedure set forth in *Paladino*. *United States v. White*, 406 F.3d 827, 835 (7th Cir. 2005) (holding that "the mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error."). We will vacate and remand the case for resentencing if the district judge indicates that he would have imposed different sentences had he known that the Guidelines were merely advisory. *Id.* If the district judge tells us that his sentences would have been no different under an advisory sentencing regime, we will affirm the original sentences provided they are reasonable. *Id.*

Both defendants also contend that the district court's order of restitution violated their Sixth Amendment rights because *Booker* requires that juries, not judges, determine restitution. We disagree. This court has ruled that the Sixth Amendment does not apply to restitution because it is a civil remedy, and one for which there is no statutory maximum. *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005). Therefore, the district court's order of restitution was unaffected by *Booker*.

### III. Conclusion

For the reasons stated above, we AFFIRM the district court's decision to grant the government's motion *in limine* and its order of restitution, but order a LIMITED REMAND with respect to the defendants' sentences.

POSNER, *Circuit Judge*, concurring. I agree that the convictions should be affirmed, but only because the exclusion of evidence about the other bank robbery was a harmless error in view of all the other evidence of the defendants' guilt. I don't agree that the evidence was irrelevant. I also think that more needs to be said about "reverse 404(b) evidence"—an unhappy formula.

Within a two-week period two bank robberies were committed within 31 miles of each other in a rural area of southwestern Illinois. Besides proximity in time and space (31 miles and 2 weeks might be the perfect distance/interval between robberies by the same gang because immediately after an armed bank robbery other banks in the immediate vicinity would be worried and increase their protective measures) and the fact that the target in each robbery was a bank, both robberies took place in towns rather than cities (the robbery of which the defendants were accused took place in Cahokia, population 16,000, and the other in New Baden, population 3,000). Both involved several robbers rather than just one and in both the robbers were black and brandished guns and, though they were male, one robber was disguised as a woman (wearing either a woman's wig or a dress). And on both occasions the robbers escaped in a recently stolen van. The defendants in our case wanted to introduce the evidence of the other robbery to show that the

other gang might have perpetrated the robbery of which they were accused.

They were entitled to do this if the evidence was relevant, Fed. R. Evid. 402, unless its probative value was substantially outweighed by (so far as bears on this case) its propensity to confuse the jury or needlessly prolong the trial. Fed. R. Evid. 403. The district judge was wrong to think that the applicable standard was given not by Rule 403 but by Rule 404(b), which forbids placing the defendant's prior crimes (or his other bad acts) in evidence in order to demonstrate that he has a propensity to commit crimes. *United States v. Paladino*, 401 F.3d 471, 474-75 (7th Cir. 2005); *United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004); *United States v. Stevens*, 935 F.2d 1380, 1401-06 (3d Cir. 1991). The defendants were trying to exculpate themselves by pinning the crimes of which they were accused on other criminals. Such a tactic is outside the scope of Rule 404(b) unless they are trying show that those they are accusing have a "propensity" to commit crimes, as demonstrated by their other crime or crimes—which is to say that they have a bad character and this is reason enough for the jury to deem them guilty of the present crime as well.

Rule 404(b) is not limited to the case in which the defendant seeks its protection, *United States v. Della Rose*, 403 F.3d 891, 901-02 (7th Cir. 2005); *Agushi v. Duerr*, 196 F.3d 754, 760-61 (7th Cir. 1999); *United States v. Lucas*, 357 F.3d 599, 604-05 (4th Cir. 2001), though that is the usual case (hence our initial description of the rule). But its only purpose, whoever is invoking it, is to prevent the facile expedient of claiming that since *X* (whether the defendant or anyone else) committed crime *a* on some previous occasion, probably he committed crime *b* on this occasion, even if there is no reason to suppose this other than his having demonstrated by his previous crime a proclivity for committing criminal acts. *Id.* at 605-06. The defendants were not arguing that the New Baden robbers had shown by

their criminal act a proclivity to commit robberies, such as the Cahokia robbery of which the defendants were accused. They were trying to show, from the *similarity* of the two crimes, that the New Baden robbers were likely to have committed the Cahokia robbery as well. Such a use of other-crimes evidence is allowed by the exception in Rule 404(b) for proof of identity (i.e., the identity of the Cahokia robbers). *United States v. Puckett*, 405 F.3d 589, 596 (7th Cir. 2005); cf. *United States v. Lawson*, 410 F.3d 735, 741 (D.C. Cir. 2005). Its admissibility is therefore governed by Rules 402 and 403; Rule 404(b) falls out.

Evidence is relevant, and therefore not barred by Rule 402, if it increases the strength of the case of the party who wishes to present the evidence at trial. Fed. R. Evid. 401; *Old Chief v. United States*, 519 U.S. 172, 178-79 (1997); *United States v. Hodges*, 315 F.3d 794, 800 (7th Cir. 2003); *United States v. Stevens*, *supra*, 935 F.2d at 1401-06. That criterion is satisfied here, my colleagues to the contrary notwithstanding. If believed, evidence that the New Baden robbers committed the Cahokia robbery as well would be evidence that would help the party that wants to present it and would therefore be relevant. *United States v. Bedonie*, 913 F.2d 782, 801 (10th Cir. 1990); *United States v. Day*, 591 F.2d 861, 880-81 (D.C. Cir. 1978). The similarity between the robberies suggested that they might have been committed by the same gang, and as it was conceded that the defendants had not committed the New Baden robbery (those robbers were caught; the conviction of one of them was affirmed in *United States v. Donaby*, 349 F.3d 1046, 1047 (7th Cir. 2003)), it followed that if the robberies were committed by the same gang the defendants were innocent of the Cahokia robbery. The police report on that robbery described the robbers' modus operandi as similar to that of the New Baden robbers. Had the evidence of the New Baden robbery been admitted, it would have strengthened the case for an acquittal. It was therefore relevant. *United*

*States v. Green*, 786 F.2d 247, 252 (7th Cir. 1986); *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996); *United States v. Stevens*, *supra*, 935 F.2d at 1401-06; *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980).

No single one of the similarities between the two robberies (the race of the perpetrators, the use of a stolen van as a getaway vehicle, etc.) established a high likelihood that the same gang committed both. But to the extent that the similarities were independent of each other, the probability that all were coincidences was much smaller than the probability that each one, taken separately, was. The probability that a series of independent observations are all false is the multiple of the probability that each is. Suppose the probability that each of five similarities between the two robberies was *not* due to the robbers being the identical people was 90 percent; nevertheless the probability that all five similarities were not due to their being identical would be only 50 percent. The numbers are arbitrary; the principle is not: a number of weak similarities if they point in the same direction can constitute respectable evidence. The majority's reason for denying the "relevance" of the evidence in this case—that the similarities between the New Baden robbery and the Cahokia robbery are "generic"—has to do not with relevance but with the probative value of the evidence.

By making relevant evidence excludable only if its probative value is *substantially* outweighed by competing considerations such as the risk that the evidence will confuse the jury, Rule 403 establishes a presumption in favor of the admissibility of relevant evidence. E.g., *United States v. Krenzelok*, 874 F.2d 480, 482-83 (7th Cir. 1989); *Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472, 478-80 (1st Cir. 2000); *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990). The district judge did not rule that the presumption was rebutted; misled by Rule 404(b), he never mentioned Rule 403. I find nothing to indicate that the presumption *was* rebutted. The jury could no more have

been confused by the evidence concerning the New Baden robbery than it could have been confused by an alibi witness who testified that the defendants were somewhere else when the Cahokia bank was robbed. The evidence that the defendants wanted to present was similar to alibi evidence; it tended to show that they were somewhere else when the bank was robbed because the robbery was committed by another gang. That is better evidence than an alibi; if believed, it solves the crime.

Of course at some point the resemblance between two crimes becomes so attenuated that a jury would scratch its collective head in puzzlement were it given evidence of a second crime to cogitate over—suppose the defendants had argued that the modus operandi of the Cahokia robbers was identical to that of the robbery of a bank in Yokohama in 1946. But the proximity and resemblance of the two crimes were sufficiently close that a jury would have realized why the New Baden crime was being injected into the case and would have weighed it rationally against the other evidence. E.g., *United States v. Crosby, supra*, 75 F.3d at 1348-49. It is shortsighted of the government to deny this, since if the defendants had committed the New Baden robbery the government would undoubtedly be arguing that the evidence of that robbery should be admissible in the present case to prove the defendants guilty of the Cahokia heist, under the identity and modus operandi exceptions to Rule 404(b)'s exclusion of prior-crimes evidence when offered to show guilt rather than innocence. E.g., *United States v. Robinson*, 161 F.3d 463, 466-68 (7th Cir. 1998); *United States v. Moore*, 115 F.3d 1348, 1353-56 (7th Cir. 1997); *United States v. Smith*, 103 F.3d 600, 602-04 (7th Cir. 1996); *United States v. Almendares*, 397 F.3d 653, 661-63 (8th Cir. 2005). What is sauce for the goose should be sauce for the gander. Evidence admissible under Rule 404(b) to establish modus operandi should be admissible under Rule 403 to show that another set of criminals employed the

same modus operandi that was used in the crime of which the defendants are accused.

The less probative a piece of evidence is, and thus the less the benefit to the truth-determining function of the jury of admitting it at trial, and the more trial time the presentation of the evidence would consume and the likelier the evidence would be to confuse the jurors by distracting them from more probative evidence, the stronger the argument for exclusion. *United States v. Urfer*, 287 F.3d 663, 665 (7th Cir. 2002); *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343-47 (3d Cir. 2002); 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5216 (1978 ed. & 2004 supp.). Evidence that takes time to present and digest but contributes little to the jurors' understanding of the real issues in the case is a kind of noise, obstructing rather than advancing understanding. *Manuel v. City of Chicago*, 335 F.3d 592, 596-97 (7th Cir. 2003); *United States v. Reed*, 259 F.3d 631, 634-35 (7th Cir. 2001); *United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979); *United States v. Layton*, 767 F.2d 549, 551, 556 (9th Cir. 1985). It should be kept out. But the trial in this case lasted only four days and the evidence concerning the New Baden robbery would have required only an hour or two to put before the jury.

Preventing a defendant from offering relevant evidence on the basis of vague and implausible concerns with jury confusion and the burden of a longer trial violates Rule 403. The error is especially clear when the balance required by Rule 403 is struck by the court of appeals without the benefit of the district judge's view of the matter; review of district judges' rulings on the admissibility of evidence is deferential precisely because the trial judge has a better opportunity to assess the particular jury's ability to assimilate particular types of evidence. *United States v. Van Dreel*, 155 F.3d 902, 905-06 (7th Cir. 1998); *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992). For appellate

judges to exercise discretion vested in district judges is particularly gratuitous when as in this case there is a perfectly adequate alternative ground of decision: the error in excluding the New Baden evidence was harmless because the evidence of the defendants' guilt was crushing. The two other members of the gang that robbed the Cahokia bank, Paschal and Townsend, pleaded guilty and testified against our two defendants, Seals and Johnson, furnishing detailed accounts of the role each of the two had played in the offense. A relative of Paschal testified that on the day of the robbery she had seen all four leaving her house together carrying guns and wearing fatigues (the attire of the Cahokia robbers), that Paschal had told her they planned to rob a bank, and that he had returned to the house later with wads of cash. Seals and Johnson bought cars for cash shortly after the robbery and neither of them offered a plausible alternative explanation for where they'd gotten the cash. Seals's mother testified that she had bought one of the cars as a present for her son, but on cross-examination admitted to earning only $8 an hour, and though the sales invoices listed her as the purchaser of the car the salesman testified that the actual purchaser had been a young black male.

All this evidence of guilt means that the defendants' evidence concerning the other gang of robbers was unlikely to be believed. That is relevant to harmlessness but is not the test of relevance; the test of relevance is whether, *if believed*, the evidence would help the party that wants to present it. *United States v. Bedonie*, 913 F.2d 782, 801 (10th Cir. 1990); *United States v. Day*, *supra*, 591 F.2d at 880-81. "The judge cannot make decisions as to the weight of the evidence under the guise of determining relevance." 22 Wright & Graham, *supra*, § 5165; see also *United States v. Hubbard*, 61 F.3d 1261, 1274 (7th Cir. 1995); *Robinson v. Runyon*, 149 F.3d 507, 512-13 (6th Cir. 1998). The judge can and indeed must make such a decision when a serious Rule

403 issue is raised, but it wasn't here; as I said, there was no danger that evidence of the New Baden robbery would confuse the jury or protract the trial unreasonably, unless the judge allowed the evidence to be presented in tedious detail, which he need not and would not have done.


A true Copy:

     Teste:


_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*