# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3157

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JIM WISZOWATY, doing business as
C.O.G. INCORPORATED,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 CR 9—**James T. Moody**, *Judge.*

ARGUED SEPTEMBER 10, 2007—DECIDED OCTOBER 22, 2007

Before EASTERBROOK, *Chief Judge*, and KANNE and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. A jury convicted Jim Wiszowaty, an orthopedic and prosthetic products salesman, of one count of conspiracy to commit health care fraud and 64 counts of health care fraud. He was sentenced to a 41-month prison term. Wiszowaty now appeals, claiming that the district court should have admitted into evidence a General Accounting Office report highlighting the poor quality of information Medicare provides to doctors. Second, he argues that the district court erred in refusing to instruct the jury that if he reasonably relied on

the statement of a public official when he acted as he did, he should be found not guilty.

Wiszowaty was a self-made man. Starting out low on the totem pole as a nursing assistant, he soon sought out greater responsibility and rewards. He eventually took a job with L'Nard and Associates, a manufacturer of medical supplies, as a sales consultant and, later, a regional product manager. At L'Nard, Wiszowaty sold medical equipment to nursing homes.

When L'Nard did away with its in-house sales team, Wiszowaty found himself in the unemployment line. Opportunity soon knocked, however, when a former L'Nard owner suggested that Wiszowaty open his own durable medical supply business, which would stock the former L'Nard owner's products.

Wiszowaty was intrigued by the idea but knew that a five-year noncompete agreement he had signed with a previous employer prevented him from hanging out his own shingle. He soon discovered a way around the problem: his wife, Debra, up until then a stay-at-home mother, could be the nominal leader of the company, and he could handle everything else, including actual sales. Debra accepted the title of "President and Chief Executive Officer" of the new company, C.O.G., Inc., and agreed to have a Medicare provider number for C.O.G. issued in her name.

Wiszowaty served as C.O.G.'s Chief Operating Officer. He handled everything from approaching nursing homes with sales pitches to instructing C.O.G.'s employees how to submit Medicare claims. C.O.G., unfortunately, had a glass ceiling, and "President/CEO Debra," who owned 100 percent of the company, took care of bookkeeping, purchasing office supplies, answering the phones, and making coffee.

C.O.G.'s big seller was a particular orthosis—a knee brace with a removable cover that helped nursing home patients walk. Wiszowaty sold each orthosis with a meager "accessory kit," which consisted of an extra cover for the device. The extra cover might be useful in a somewhat paradoxical situation: where an incontinent nursing home patient soiled the original cover and sought to continue walking with the help of the device before the dirty cover came back from the laundry.

One would think situations like this might be limited, especially since Wiszowaty's own "care plan" for the orthosis indicated that the device could be used for as little as four hours per week. Indeed, one doctor testified that a nursing home closet contained six large trash bags full of lonely, unused orthotics.

C.O.G.'s services and invoices reflected a specific pattern: the invoice C.O.G. submitted to Medicare indicated that the company delivered the brand new orthotic (with its original cover) to a nursing home patient on one day and dropped off the extra cover two days later. Nursing home employees testified, however, that Wiszowaty invariably dropped off both the original orthotic (and cover) and the replacement cover on the same day.

This situation spelled trouble for C.O.G. because, while tacking on extra accessory kits might be healthy salesmanship, Medicare will only pay for "medically necessary" durable equipment. The orthosis itself was covered; the "accessory kit" was not.

Medicare eventually smelled something fishy about the "accessory kits." After an initial investigation, it suspended C.O.G. During this "time out" period, the company could continue to provide services to Medicare patients and bill Medicare for those services, but Medicare would not actually pay those invoices until its investigation cleared C.O.G. of any wrongdoing. The suspension hit

the company hard, since the bulk of its revenue came from Medicare.

Once again, though, a resourceful Wiszowaty found opportunity in misfortune. A former L'Nard co-worker referred him to Mary Ann Habeeb, another L'Nard alum who had opened up her own durable medical equipment business, OrthoCare Concepts, in Pennsylvania.

Ever the salesman, Wiszowaty invited Habeeb and her employee, Marvin Jayman, to participate in a joint venture of sorts. Wiszowaty sought to use OrthoCare as a conduit for the sale of his supply of durable medical equipment, including the rather useless "accessory kits."

The details of the plan were fairly simple. C.O.G. sent its Medicare claims information to OrthoCare, which in turn submitted C.O.G.'s invoices to Medicare for payment using OrthoCare's provider number. Because Medicare provider numbers are nontransferable, Medicare would assume that OrthoCare—certainly not a suspended C.O.G.—was requesting compensation for services OrthoCare provided to Medicare recipients. When OrthoCare received payment from Medicare, OrthoCare remitted 80 percent of the payment to C.O.G. and kept the rest for its trouble.

Even though Habeeb and Jayman knew that C.O.G. was suspended and that Medicare supplier numbers are nontransferable, both agreed to participate in the venture. By using OrthoCare's Medicare supplier number to bill Medicare for services C.O.G. actually provided, Wiszowaty successfully circumvented the suspension and cheated Medicare out of over $139,000. This figure grew so large in part because Wiszowaty, amazingly, continued the same billing practice that originally attracted the scrutiny of Medicare investigators: tacking on "accessory kits" to orthosis orders.

By March 2002, Wiszowaty found himself alone. He and Debra had separated, and he ended his relationship with OrthoCare when he received a Medicare supplier number in his own name. This new number in hand, Wiszowaty opened his own durable medical equipment business, Illiana Orthotics. At Illiana, Wiszowaty stuck with his old bag of tricks and continued to bill Medicare for replacement knee orthosis covers. Wiszowaty's operation was cut short, however, when investigators executed a search warrant at OrthoCare and learned of its relationship with C.O.G.

Eventually, ex-spouse Debra cooperated in the investigation and entered a guilty plea to conspiring with her ex-husband to defraud Medicare. Wiszowaty rolled the dice at trial and testified that the fraudulent billing scheme was entirely Debra's idea. On the stand, Wiszowaty also claimed that he never saw or relied on any Medicare bulletins, rules, or regulations. Only on cross-examination did he contend that, after he opened Illiana Orthotics, he called AdminaStar Federal, a Medicare contractor that processes durable medical equipment claims, to ask whether he could properly bill Medicare for the extra covers. Wiszowaty testified that, at some time he could not recall, he spoke to "a Judith, a Frank, and an Erin," who all informed him that his billing practices were appropriate.

The jury obviously rejected Wiszowaty's attempt to shift the blame onto Debra. Its verdict was a complete rejection of any claim that he was an innocent bystander to the billing scheme that bilked Medicare out of over $350,000.

On appeal, Wiszowaty argues that the district court (Judge James T. Moody) erred when it kept a GAO report, entitled "Communications with Physicians Can Be Improved," from the jury. The report concluded, among other

things, that the information carriers[1] provide to physicians is often difficult to use, inaccurate, and incomplete.

We review district court evidentiary rulings for an abuse of discretion. *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). That standard of review, of course, is quite deferential.

The GAO report discussed the accuracy and completeness of information doctors received from three sources of information: carrier bulletins, telephone call centers, and Web sites. Wiszowaty argues that the report was relevant and admissible because it would have helped the jury sort out whether or not AdminaStar representatives gave him accurate information about billing Medicare for his replacement orthosis covers.

Judge Moody did not abuse his discretion in excluding the report. The government proffered that its author was prepared to testify that the study focused narrowly on doctors'—not Medicare service providers'—communications with Medicare carriers. Introducing a study of controlled test calls to five call centers by GAO employees posing as doctors would not have helped the jury determine whether, in fact, Wiszowaty got a green light from "a Judith, a Frank, and an Erin" (he could not recall any last names) at AdminaStar to bill Medicare for a specific orthosis cover. Judge Moody properly concluded that this evidence was confusing and irrelevant.

We are also unpersuaded by Wiszowaty's second argument: that the district court erred in refusing to give a "reliance on public authority" theory of defense instruction to the jury. We review a district court's decision not to give a particular instruction with deference because a

---

[1] The report describes "carriers" as contractors, usually insurance companies, that process certain Medicare claims.

trial judge has "substantial discretion" with respect to the "specific wording" of the instructions that are given. *United States v. Rice*, 995 F.2d 719, 724 (7th Cir. 1993). Our concern is that the essential bones of contention be covered, and in this case they were.

Wiszowaty requested Seventh Circuit Pattern Jury Instruction 6.07, which provides that a defendant who reasonably relies on public authority does not act knowingly and should be found not guilty.

The Committee Comment to Instruction 6.07 clarifies it as "a species of good faith." In a separate instruction, the district court here told the jury that if Wiszowaty acted in good faith, he did not act willfully, and, as a result, did not meet a necessary element of the conspiracy and health care fraud charges. Thus, if the jury believed Wiszowaty's story—that he reasonably relied on the instructions of "Judith, Frank, and Erin" at AdminaStar— it could conclude that Wiszowaty was not guilty because he acted in "good faith." In sum, the district court's instructions covered the "essential points" of the instruction Wiszowaty requested. *See United States v. Howell*, 37 F.3d 1197, 1203-04 (7th Cir. 1994). The district court's failure to include the "reliance on public authority" instruction did not deprive Wiszowaty of a fair trial.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*