# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1961

_____

United States of America

*Plaintiff - Appellee*

v.

Mario A. Thibeaux

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 13, 2015
Filed: May 4, 2015

_____

Before LOKEN, MURPHY, and MELLOY, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Mario Thibeaux of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court[1] imposed a sentence of 120 months in prison. Thibeaux appeals, challenging the sufficiency of the evidence that

---

[1]The Honorable Greg Kays, Chief Judge, United States District Court for the Western District of Missouri

he possessed the handgun in question, the district court's exclusion of evidence of a subsequent firearm offense by the other suspect, and his sentence. We affirm.

## I. Sufficiency of the Evidence

We review a sufficiency of the evidence claim do novo and will reverse only if no reasonable jury could have found Thibeaux guilty, viewing the evidence in the light most favorable to the jury's verdict. See, e.g., United States v. Cowling, 648 F.3d 690, 700 (8th Cir. 2011), cert. denied, 132 S. Ct. 1905 (2012). Thibeaux stipulated that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, and that the firearm in question was manufactured in Argentina. Thus, as in many felon-in-possession cases, the issue at trial was whether Thibeaux knowingly possessed the firearm. See id.

The government's first witness at the August 2013 trial was Geraldine Scott. She testified that she awoke to the sound of a woman's screams outside her home on Montgall Avenue at 2:00 a.m. on February 22, 2013, the night of a heavy snowstorm. She called 911, looked out her bedroom window, and reported that two men and a woman were running around a vehicle in the street. One man, wearing "like a black and white jacket," was pointing a handgun at the other man. Scott testified the trio went into a house across the street, then the other man and the woman came out, got in the vehicle, and backed it down Montgall Avenue, a one-way street, until it got stuck in the snow at a nearby intersection. "The guy in the white jacket came out later" and went to the intersection where the car was. Scott viewed the police officers' dash cam video of the events after the officers arrived, listened to her recorded call to the 911 operator, and positively identified Thibeaux as the man in the white jacket she saw with a gun. On cross examination, Scott testified that she was first asked if she could make an identification a few weeks before trial.

The next witness, Field Training Officer Ryan Kaighen of the Kansas City Police Department, testified that he drove the lead patrol car to the scene of the reported disturbance involving a person armed with a gun. Kaighen's passenger was his probationary police officer trainee, Kameron Hylton, who was put in charge of the scene under Officer Kaighen's direction. Their patrol car was equipped with a stationary dash camera that recorded the subsequent events.

As the Officers approached, they observed a maroon SUV stuck in the snow at the intersection of Montgall Avenue and 25th Street, facing to their right down Montgall. Two males and one female were outside the passenger side of the vehicle. The two males were later identified as Mario Thibeaux and Jermaine Murray. Thibeaux was wearing a bright neon safety vest. Murray was wearing a heavy beige coat over a black shirt or jacket. As the patrol car neared, Murray and Thibeaux moved to the front of the SUV. The Officers exited the car and commanded everyone to place their hands in the air and approach. The woman complied immediately. Murray moved around the front of the vehicle to the driver's side with a shovel and paused near the driver's side front tire. Thibeaux came forward and initially put his hands in the air, then put his right hand into his front pocket, turned his back on the Officers, and moved along the rear of the vehicle.

Kaighen testified that, alarmed by Thibeaux's actions, he drew his weapon and moved to the left from the driver's side of the patrol car to a snowbank, where he had a full view of Thibeaux at the rear of the SUV. Kaighen saw Thibeaux reach into his pocket and toss a "black object" along the driver's side of the SUV. The dash cam video, taken from the right side of the patrol car's front windshield, shows Thibeaux making a tossing motion as he moved away from the Officers along the rear of the SUV, but what Thibeaux tossed (if anything) cannot be seen. When all three persons had been secured, Kaighen walked to the driver's side of the SUV and found a handgun laying "on top of the snow with no snow covering it, right next to the

driver's side of the vehicle near the front wheel," near where Murray briefly stood when the officers first arrived. Kaighen testified that he could only see that Thibeaux threw a black object, but there were no other items on the ground. Kaighen left the gun in the snow for Hylton to recover.

Hylton testified that when he exited the patrol car on the passenger side, he kept his eyes on Murray, had an unobstructed view of Murray's hands as he came from the far side of the SUV, and did not see him drop or throw anything. At Kaighen's direction, Hylton recovered the black gun lying on top of the snow on the driver's side of the SUV and unloaded it. Hylton testified that he did not know who had thrown the gun but understood from their conversation that Kaighen believed Thibeaux had thrown the gun. On cross exam, Hylton was shown the video and agreed he recovered the gun where Murray had been standing. Hylton's incident report did not include the fact that Murray had moved to the driver's side of the vehicle, paused there, and did not comply with the Officers' commands for twenty or thirty seconds. When Murray was later searched, a glass vial containing PCP was found in his left front pocket.

The recovered gun was a Bersa Piccola Thunder Semiautomatic .380, loaded with one live round and a magazine containing fifteen rounds. A forensic expert testified that he took two swabs from the firearm but was unable to match the genetic profiles to Murray or Thibeaux, which was not uncommon. After the government rested, the defense called Police Officer Elizabeth Clark, who testified that on March 30, 2013 she initiated a traffic stop of a vehicle registered to Ashley Robinson. The only occupant, a black male with dreadlocks, drove off, crashed the vehicle into a fence, and fled. Officer Clark searched the vehicle, finding a glass vial believed to contain PCP, a nine millimeter Bersa Thunder 9 Compact Pro handgun, and a driver's license belonging to Jermaine Murray. The government's rebuttal witness testified

that Bersa handguns are available at most gun shops in Kansas City and throughout the United States.

On appeal, Thibeaux argues the evidence was insufficient because the dash cam video shows Murray at the place where the firearm was recovered, Murray had a motive to drop the gun because he was a felon then in possession of PCP, and Murray was involved in a similar incident involving PCP and a Bersa handgun a few weeks later. Thibeaux argues no one saw him throw a gun, and the gun's position lying on top of the snow suggests it was dropped and not thrown. He challenges Geraldine Scott's credibility because she was not contacted until a few weeks before trial and did not mention Thibeaux's conspicuous neon safety vest to the 911 operator. Thibeaux in effect asks us to re-assess Geraldine Scott's credibility and Officer Kaighen's description of the events. But this would be contrary to the standard governing our review of a jury verdict. "We do not weigh the evidence or assess the credibility of the witnesses. The jury has the responsibility of resolving conflicts or contradictions in testimony, and we resolve any credibility issues in favor of the verdict." United States v. Augustine, 663 F.3d 367, 373 (8th Cir. 2011).

During its deliberations, the jury twice asked to review the most relevant segments of the dash cam video before returning a guilty verdict. The video confirmed that Thibeaux ignored the Officers' commands by putting his hand in his pocket, walking away from the Officers, and making a throwing motion. The jury heard Kaighen testify that he positioned himself for a clearer view than the video and saw Thibeaux throw a black object in the direction where the gun was found. They heard Hylton testify he watched Murray's hands. Particularly in light of Geraldine Scott's positive identification, this was sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Thibeaux had been in possession of the gun found in the snow. The jury rejected Thibeaux's plausible argument that the evidence pointed more strongly to Murray being the one who discarded the handgun.

-5-

"Where a reasonable-minded jury could have found evidence sufficient to convict, we will not disturb the verdict just because a different jury might have reached a different conclusion." United States v. Peters, 462 F.3d 953, 958-59 (8th Cir. 2006); see United States v. Walker, 393 F.3d 842, 847 (8th Cir.), cert. denied, 546 U.S. 953 (2005); United States v. Anderson, 78 F.3d 420, 422 (8th Cir. 1996).

## II.  The Evidentiary Issue

After Officer Clark testified to the March 2013 incident involving Jermaine Murray, defense counsel advised the court that Murray was also involved in a shootout in June 2013 during which a witness observed him hand PCP and a .40 caliber Taurus handgun to a woman identified as Ashley Robinson before the police arrived.  Counsel argued that Clark's testimony that the car stopped in March was registered to Robinson made the second event in June relevant to Thibeaux's defense. The court asked, "What do you suggest we do?"  Counsel responded, "I would simply offer" the ATF agent's investigative report of the June incident.  The government had not objected to evidence of the March incident involving Murray, PCP, and a Bersa handgun because of its proximity to the February 2013 incident at issue in the trial. But the government objected to evidence relating to the June incident, citing Rule 403 of the Federal Rules of Evidence and arguing that this was a collateral issue that would lead to confusion of the issues and an undue waste of time.  The district court agreed and denied defense counsel's request.

On appeal, Thibeaux argues the district court abused its discretion by not allowing him to present evidence regarding the second incident because it tended to negate the defendant's guilt. See United States v. McGilberry, 620 F.3d 880, 886 (8th Cir. 2010) (standard of review).  Evidence of other crimes committed by another person to show that person committed the crime at issue is admissible, provided the circumstances of the other crime are sufficiently similar to make it relevant.  See

United States v. Seals, 419 F.3d 600, 607 (7th Cir. 2005), and 611-13 (Posner, J., concurring), cert. denied, 546 U.S. 1047.  However, such evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue."  Holmes v. South Carolina, 547 U.S. 319, 327 (2006) (quotation omitted).

Here, the June 2013 incident was months removed in time and involved different circumstances and a different model handgun.  Thibeaux's request was untimely, and no person present at trial had first-hand knowledge of the June crime.  That incident was likely to be complex, resulting in a mini-trial regarding a collateral matter.  Moreover, evidence that Murray had PCP and a handgun in June would be cumulative to Officer Clark's testimony regarding the March incident, so denying Thibeaux's belated request in no way prevented him from proving his defense.  In these circumstances, there was no abuse of the district court's Rule 403 discretion.  See United States v. Battle, 774 F.3d 504, 512-14 (8th Cir. 2014), cert. denied, 2015 WL 1289842 (2015).[2]

## III.  Sentencing Issues

Thibeaux's Presentence Investigation Report recommended a base offense level of 24 because he had committed two prior offenses that were either a crime of violence or a controlled substance offense.  See USSG § 2K2.1(a)(2).  The PSR also recommended an enhancement under § 4B1.4(b)(3) because Thibeaux was an Armed Career Criminal, resulting in a total offense level of 33 and an advisory guidelines

---

[2]Thibeaux also argues the court abused it discretion by not continuing the trial while he found witnesses and officers involved in the June event.  As no continuance was explicitly requested, this issue was not preserved.

range of 235 to 293 months in prison. Thibeaux objected to the enhancement and to the base offense level determination under § 2K2.1(a)(2), arguing that his base offense level should be 20 under § 2K2.1(a)(4).

At sentencing, the district court found that the Armed Career Criminal Act does not apply. But it overruled Thibeaux's objection to base offense level 24 under §2K2.1(a)(2), finding that his previous felon-in-possession conviction was a crime of violence because the firearm possessed was a sawed-off shotgun. The court sentenced Thibeaux to 120 months, the statutory maximum for his offense, expressly stating, "even if I would have . . . found him at . . . category 20 my sentence would still be the same in this case under the [18 U.S.C. §] 3553(a) analysis."

**A. The Claim of Procedural Error.** On appeal, the parties agree the district court committed procedural error when it determined that Thibeaux's prior felon-in-possession offense was a crime of violence under § 2K2.1(a)(2). We accept the government's concession without considering that issue. Without this enhancement, the base offense level was 20, not 24, resulting in an advisory guidelines range of 70 to 87 months. The government contends the sentence should nonetheless be affirmed because the procedural error was harmless. We agree.

"Incorrect application of the Guidelines is harmless error where the district court specifies the resolution of a particular issue did not affect the ultimate determination of a sentence." United States v. Straw, 616 F.3d 737, 742 (8th Cir. 2010). The § 3553(a) factors the district court emphasized were Thibeaux's substantial criminal history over an extensive period of time, and the fact that in serving every previous felony conviction his probation, parole, or supervised release had been revoked, showing a lack of respect for the law and the need for a longer sentence to deter further criminal activity. The court "clearly identified the contested crime-of-violence issue . . . and adequately explained its overall sentence applying

18 U.S.C. § 3553(a)." <u>United States v. Sayles</u>, 674 F.3d 1069, 1072 (8th Cir. 2012). Therefore, the procedural error was harmless.

**B. Substantive Reasonableness.**  Thibeaux argues the 120-month sentence is substantively unreasonable because the district court did not give sufficient weight to the fact that his last felony conviction occurred in 2004 and that he had been employed since 2009.  We review substantive reasonableness for abuse of discretion. The district court has wide latitude to weigh the § 3553(a) factors and assign some factors greater weight than others.  <u>United States v. Roberts</u>, 747 F.3d 990, 992 (8th Cir. 2014).  Here, the district court did not abuse its wide sentencing discretion in placing particular emphasis on Thibeaux's extensive criminal history and demonstrated lack of respect for the law.

The judgment of the district court is affirmed.

_____